Matthew G. Summers, Esquire *(pro hac vice application forthcoming)*
Laurel D. Roglen, Esquire
**Ballard Spahr LLP**
919 N. Market Street, 11th Floor
Wilmington, DE 19801
Direct: (302) 252-4428
E-mail: summersm@ballardspahr.com
       roglenl@ballardspahr.com

*Attorneys for Wells Fargo Bank, National Association, as Trustee*

Obj. Deadline: August 22, 2023 at 4:00 p.m. ET

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
| | |
|---|---|
| In re : | Chapter 11 |
| : | |
| 856 GREENE AVENUE PROPERTIES LLC, : | Case No. 23-41636 (ESS) |
| : | |
| Debtor. : | |
| : | |

------------------------------------------------------------x

**OBJECTION OF WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE, TO APPLICATION FOR ORDER AUTHORIZING DEBTOR TO EMPLOY NORTH POINT REAL ESTATE GROUP AS REAL ESTATE BROKER IN CONNECTION WITH THE SALE OF THE DEBTOR'S REAL PROPERTY**

Wells Fargo Bank, National Association, as Trustee for Morgan Stanley Capital I Trust 2019-H6, Commercial Mortgage Pass-Through Certificates, Series 2019-H6 (the "Lender"), by its undersigned attorneys, hereby files this objection (the "Objection") to the *Application for Order Authorizing Debtor to Employ North Point Real Estate Group as Real Estate Broker in Connection with the Sale of the Debtor's Real Property* [Docket No. 16] (the "Application"), and in support thereof states as follows:

**I.    FACTUAL BACKGROUND**

A.    **The Debtor's Bankruptcy Filing & Assets**

1.    On May 10, 2023 (the "Petition Date"), 856 Greene Avenue Properties LLC (the "Debtor") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor continues to operate its business and manage its

properties as debtor-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.[1] No trustee, examiner, or statutory committee has been appointed.

2. The Debtor's sole business is to own and operate a five-story multifamily property comprising 10 units located at 856 Greene Avenue, Brooklyn, New York (as more specifically described in the Mortgage, as hereinafter defined, the "Property"). The Debtor's case is a "single asset real estate" within the meaning of Section 101(51B) of the Bankruptcy Code, as the Debtor acknowledged by checking the applicable box in its voluntary petition commencing this case.

3. The Debtor scheduled the value of the Property as being $5 million in Schedule D.

B. **The Debtor's Indebtedness to the Lender**

4. On or about April 2, 2019, Cantor Commercial Real Estate Lending, L.P. (the "Original Lender"), made a commercial mortgage loan to Borrower in the principal amount of $6,200,000.00 (the "Loan"). Borrower used the proceeds of the Loan to refinance a prior mortgage on the Property.

5. The Loan is evidenced by, among other documents, a Loan Agreement dated April 2, 2019, and an Amended, Restated and Consolidated Promissory Note from Borrower to Original Lender in the principal amount of $6,200,000.00 dated April 2, 2019 (the "Note"). True and correct copies of the Loan Agreement and Note are attached hereto as, respectively, Exhibits A & B. Lender is in possession of the original Note.

6. To secure repayment on the Note, Borrower executed in favor of Original Lender an Amended, Restated and Consolidated Mortgage and Security Agreement dated as of April 2, 2019 (the "Mortgage"), which granted Original Lender and its successors and assigns as security

---

[1] All statutory references to "Section" are to the Bankruptcy Code.

interest in the Property.  The Mortgage was recorded with the Office of the City Register of the City of New York (the "Recorder") on April 24, 2019, as CRFN 2019000131425.  A true and correct copy of the Mortgage is attached hereto as Exhibit C.

7. The Loan is further secured by an Assignment of Leases and Rents dated April 2, 2019 (the "ALR") and recorded with the Recorder on April 24, 2019, as CRFN 2019000131426.  A true and correct copy of the ALR is attached as Exhibit D.  The Mortgage and ALR grant the Lender a properly perfected first priority security interest in the Property and all leases, rents, and proceeds thereof.  The Original Lender also recorded a UCC-1 financing statement with the Recorder on April 24, 2019, as CFRN 20190042400534006, and, on July 1, 2023, a UCC-3 assigning the original financing statement to Lender, as CRFN 2019070100152003.  True and correct copies of the original financing statement and assignment filed with the Recorder are attached as Exhibit E.

8. The Loan was securitized and was assigned by Original Lender to Lender via a General Assignment and an Assignment of Mortgage, which was recorded with the Recorder on July 1, 2019, as CRFN 2019000205811.  A true and correct copy of the Assignment of Mortgage is attached hereto as Exhibit F.

9. The Debtor defaulted in making payments on account of the Loan in March 2020 and then stopped making monthly payments on account of the Loan in December 2022.  Thereafter, Lender provided a Notice of Default to Borrower by letter dated March 12, 2021.  Lender subsequently accelerated the indebtedness owed to Lender under the Loan Documents by letter dated March 25, 2021.  True and correct copies of the March 12, 2021, and March 25, 2021 notices are attached hereto as, respective, Exhibits G & H.

10. As of January 6, 2023, the Debtor owed the amount of at least $8,305,186.87 to Lender as detailed in the payoff statement attached hereto as Exhibit I. Interest has continued to accrue, and the Lender continues to incur attorneys' fees and expenses.

11. Prior to the Petition Date, Lender commenced a foreclosure action with respect to the Property in the United States District Court for the Eastern District of New York (the "District Court"), Civil Action No. 21-6255 (the "Foreclosure Action"), and, on March 6, 2023, the Lender filed a motion for summary judgment in the Foreclosure Action (the "Summary Judgment Motion"). The Debtor filed a motion with the District Court seeking to extend its deadline to respond to the Summary Judgment Motion. The District Court granted, in part, the Debtor's motion to extend time, established May 10, 2023 as the deadline for filing a response to the Summary Judgment Motion, and stated no further extensions would be granted to the Debtor. Rather than filing a response to Summary Judgment Motion, the Debtor commenced this case on the date its response to the Summary Judgment Motion was due.

## II. ARGUMENT

12. On July 17, 2023, the Debtor filed the Application, seeking to retain North Point Real Estate Group ("North Point") as "real estate advisor" for the Debtor pursuant to a Retention Agreement attached to the Application. The Lender and the Debtor agreed that the Lender's response deadline would be August 22, 2023, two days before the date noticed for presentment of the proposed order and the deadline noticed for objections. Notably, the services North Point proposes to provide to the Debtor pursuant to the Retention Agreement go well beyond the scope of traditional real estate broker services to market and pursue a sale of the Property, and instead, purport to include authority to "arrange a joint venture, financing or recapitalization, negotiate

4

refinancing, reinstatement, discounted payoff, sell, net lease or otherwise dispose of all or a portion" of the Property.

13. The Lender generally does not object to the Debtor engaging a real estate broker to market the property for sale to a third party and the Debtor engaging in a reasonable sale process of approximately 60-90 days to test the market and endeavor to identify a third party to acquire the Property under a plan so long as, among other things, the Lender is receiving adequate protection payments during that marketing time, an appropriate cash collateral stipulation is agreed to by the Debtor and Lender, and approved by this Court, and the Lender's right to credit bid pursuant to Section 363(k) is undisturbed.

14. However, any sale process, which is being funded with the Lender's cash collateral and in a situation where the Lender's consent will be required for a sale under almost any circumstance, must be undertaken on reasonable terms and at a reasonable cost. This is where the Application fails as it is not on reasonable terms or at a reasonable cost, and, through a very unusual fee structure, seeks to severely impair the Lender's right to credit bid or even sell the Property to a third party without further payment North Point if the Lender's credit bid is successful.

15. The Retention Agreement simply provides unreasonably rich compensation for its proposed services. In addition to a $100,000 retainer and a 6% commission in connection with the closing of a sale of the Property, if the Lender is the successful bidder through a credit bid, then **the Lender**, not the Debtor, would be required to pay North Point $150,000. (Retainer Agmt. ¶3.c). Further, "[i]f any assignee of Lender not affiliated with Lender is the successful purchaser and/or closes on the purchase of the Property, then the assignee must pay the buyer's premium equal to six percent (6%) of the gross purchase price for the Property." (*Id.*).

16. The Retention Agreement further provides a series of exorbitant fees to be paid to North Point in the event the Lender agrees to various consensual resolutions of its secured claims. For example, in the event the Lender agrees to refinance, borrow against, or restructure its existing secured debt encumbering the Property, recapitalize the Property, or enter into a joint venture with respect to the Property, then the Debtor will be required to pay North Point a fee of 6% of the aggregate amount of refinancing, which amount of refinancing could be millions of dollars. (*Id.* at ¶4). If the Lender agrees to a reduced payoff of its debt, then North Point will receive a fee of 20% of the difference between the full payoff amount and the agreed reduced payoff amount—again, which difference could be in the millions of dollars. (*Id.* at ¶6). If the Lender agrees to a deed in lieu or agreed plan terms resulting in the transfer of title to the Property to the Lender or its designee, North Point would again be entitled to 20% of any cash payment to the Debtor in connection therewith. (*Id.* at ¶8). Given the difference between the Debtor's asserted $5 million value and the more than $8 million owed to the Lender, North Point could receive a fee in excess of $600,000 in such circumstances, even though its efforts to sell the Property to a third party (North Point's primary assignment) will necessarily have failed.

17. In fact, even if no transactions are achieved in connection with the Retention Agreement, North Point will nevertheless be entitled to payment of $100,000 from the Lender's cash collateral held by the Lender, in addition to out-of-pocket costs. (*Id.* at ¶¶7 & 10).

18. Importantly, the Retention Agreement is set up for signature by the Debtor, North Point, and the Lender, and although the filed version has been executed by the Debtor and North Point, ***the Lender has not and will not execute the Retention Agreement***.

19. The Debtor seeks to retain North Point pursuant to Section 327(a) of the Bankruptcy Code, however Section 328 also applies to employment of estate professionals, only

permitting such engagement on "reasonable terms and conditions." 11 U.S.C. § 328(a); *see also Riker, Danzig, Scherer, Hyland & Perretti v. Official Comm. of Unsecured Creditors (In re Smart World Techs., LLC)*, 552 F.3d 228, 232 (2d Cir. 2009)).

20.     Section 328(a) of the Bankruptcy Code requires the Court to determine the reasonableness of a professional's fee on a prospective basis prior to approving retention. *See In re Smart World Techs., LLC*, 552 F.3d at 232; *In re XO Commc'ns Inc.*, 398 B.R. 106, 112 (Bankr. S.D.N.Y. 2008). Once a professional's retention is approved under section 328(a), the court's power to award different compensation later is very limited. *See In re Energy Partners, Ltd.*, 409 B.R. 211, 223 (Bankr. S.D. Tex. 2009) ("Once a bankruptcy court approves a professional's compensation under § 328, only extremely limited circumstances warrant altering that compensation."); *see also In re ASARCO, L.L.C.*, 702 F.3d 250, 258 (5th Cir. 2012); *In re Smart World*, 552 F.3d at 232; *In re High Voltage Eng'g Corp.*, 311 B.R. 320, 332 (Bankr. D. Mass. 2004). Changing compensation after the fact, is a "high hurdle", and courts rarely alter the original terms of retention. *In re ASARCO*, 702 F.3d at 258 (citations omitted).

21.     In light of this standard, it is essential, up front, that there is sufficient evidence regarding the reasonableness of the proposed compensation before pre-approving such terms. *See Energy Partners*, 409 B.R. at 229 ("[Section] 328 applications require particularly close scrutiny at the outset because the money paid to these professionals will be even more difficult, if not virtually impossible, to disgorge once distributed.") (citations omitted). The burden is on the moving party to prove by evidence, not conclusory statements, that the proposed terms and conditions of a proposed retention are reasonable under section 328(a). *In re High Voltage Eng'g Corp.*, 311 B.R. at 333.

22. In considering whether to approve a professional's retention pursuant to section 328(a), courts will consider a variety of factors, including a list of factors enumerated in the oft-cited case of *In re Insilco Techs., Inc.*, 291 B.R. 628, 634 (Bankr. D. Del. 2003). *See, e.g.*, *Energy Partners*, 409 B.R. at 226 (citing *Insilco* factors). These factors include:

> (1) whether terms of an engagement agreement reflect normal business terms in the marketplace; (2) the relationship between the Debtor and the professionals, i.e., whether the parties involved are sophisticated business entities with equal bargaining power who engaged in an arms-length negotiation; (3) whether the retention, as proposed, is in the best interests of the estate; (4) whether there is creditor opposition to the retention and retainer provisions; and (5) whether, given the size, circumstances and posture of the case, the amount of the retainer is itself reasonable.

*Energy Partners*, 409 B.R. at 226 (citations omitted).

23. Here, the Debtors wholly fail to meet this standard. The Application refers only to the 6% commission to North Point from proceeds of a sale of the Property (not any of the other many and varied ways North Point would earn high fees under the Retention Agreement) and states that this particular commission is "both fair and reasonable and is customary of commissions earned by brokers when selling properties such as the Debtor's." (Application, ¶¶7 & 8). The Debtors' conclusory statement that the 6% sale commission is "fair and reasonable" is unsupported by any evidence or case law. Moreover, the Application fails to adequately describe or provide any support whatsoever for the "reasonableness" of the various other fees that would be required to be paid to North Point under the Retention Agreement for various transactions.

24. Moreover, the fee structure proposed by the Retention Agreement unduly restricts the Lender's right to credit bid. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012) (upholding a secured creditor's right to credit bid under Section 363(k) of the Bankruptcy Code, regardless of whether approval of the sale is pursued through a plan). Indeed, a secured creditor has the "automatic right to credit bid up to the full amount of its claim." *ASSF*

*IV AIV B. Holdings II, L.P. v. Empire Generating Co., LLC (In re Empire Generating Co., LLC)*, Case No. 19-cv-5721 (CS), 2020 U.S. Dist. LEXIS 50040, at *31 (S.D.N.Y. Mar. 23, 2020). The Retainer Agreement's purported requirement for the Lender to pay North Point $150,000 in the event it is the successful bidder for the Property is an impermissible burden on the Lender's right and ability to freely credit bid its full secured claim on the Property.

25. Lender submits that no fees or commissions are reasonable or appropriate to be paid to North Point in connection with any refinancing or restructuring of the Lender's existing secured debt, any agreement by Lender to a reduced payoff of its debt, or agreement of Lender to a deed in lieu or agreed plan terms resulting in the transfer of title to the Property to the Lender or its designee. North Point is simply not a participant in the negotiation of any such transactions between the Debtor and Lender—which negotiations were ongoing long before the commencement of this bankruptcy case—so it is inappropriate to compensate North Shore (especially at such high rates), in connection therewith.

26. In addition to these failings, there is no basis under Section 327 or 328 of the Bankruptcy for the Debtors to purport to require a non-Debtor third-party to pay a Debtor's professional. (*See* Retainer Agmt. ¶3.c (purporting to require ***the Lender*** to pay $150,000 to North Point in the event the Lender is a successful purchaser)). The Lender has not signed the Retention Agreement and will not agree to any direct obligation from the Lender to North Point in connection with any potential transaction.

27. Lender is willing to allow the Debtor to pursue a process to market the Property for a potential sale to a third-party, and of course understands there are certain fees and costs in connection a broker for that process will be necessary and appropriate. The Lender proposes that it will agree to engagement of a broker, including North Point, under a compensation structure

that provides that in the event a sale of the Property to a third-party closes, the Debtor will pay to the broker out of the proceeds of such sale all actual costs and expenses incurred by the broker in connection with the sale process up to the amount of $10,000, plus a reasonable fee for actual time spent on the matter not to exceed $15,000 in the event the Property is sold to the Lender on account of a credit bid. The Lender submits such compensation would be reasonable and appropriate under the facts and circumstances of this bankruptcy case.

28. Moreover, if North Point is unwilling to serve as real estate broker on these terms, there are undoubtedly many other well-qualified commercial brokers who would do so, and the Debtor should be required to obtain pricing proposals from other brokers.

### III. CONCLUSION

The Lender requests that this Court deny the Application, and to the extent the Court decides to approve the engagement of a real estate broker, the terms of such engagement comport with the above proposed terms.

Dated: August 22, 2023
Wilmington, Delaware

Respectfully submitted,

*/s/ Laurel D. Roglen*
Matthew G. Summers, Esquire (*pro hac vice application forthcoming*)
Laurel D. Roglen, Esquire
**Ballard Spahr LLP**
919 N. Market Street, 11th Floor
Wilmington, DE 19801
Direct: (302) 252-4428
Fax: (302) 300-4065
E-mail: summersm@ballardspahr.com
         roglenl@ballardspahr.com

*Attorneys for Wells Fargo Bank, National Association, as Trustee*